**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| **STEPHEN SCHALLER,** | ) | |
| | ) | |
| **Plaintiff.** | ) | |
| | ) | **No. 3:04-0545** |
| **v.** | ) | |
| | ) | **JUDGE TRAUGER** |
| | ) | **JUDGE KNOWLES** |
| **DONELSON AIR CONDITIONING** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendant

Donelson Air Conditioning Company (Docket No. 12), to which the plaintiff Stephen Schaller

has responded (Docket No. 17) and the defendant has replied (Docket No. 23).

## FACTS and PROCEDURAL HISTORY

Plaintiff Stephen Schaller is a fifty-four year-old breast cancer survivor and a former

employee of defendant Donelson Air Conditioning Company ("Donelson" or "DAC"). Schaller

was initially hired in July 2001 as a weekend dispatcher who was responsible for receiving and

dispatching technician service calls; in May of 2002, he was moved to the call center to work as

a customer service representative. (Docket No. 20, Attach. 7, Deposition of Stephen Schaller at

pp. 27, 33–34) As a customer service representative, Schaller was responsible for receiving in-

bound calls from customers, setting and confirming appointments with customers, and

1

performing some clerical work.  *Id*. at p. 34.  According to Schaller, there were, on average, five other customer service representatives working at a time.  *Id*.

On August 23, 2002, Schaller took a thirty-day leave of absence, pursuant to the Family Medical Leave Act (FMLA), in order to seek treatment and surgery for breast cancer.[1]  At this time, Schaller underwent a full mastectomy to his right breast.  (Docket No. 24, Defendant's Responses to Plaintiff's Additional Facts in Opposition to Defendant's Motion for Summary Judgment, at ¶ 2)

Upon his return, Schaller was assigned to a new job in which his sole function was "cleaning up" Donelson's customer database.  *Id*. at ¶ 3.  According to Schaller, he had done some preliminary work on the database before taking his FMLA leave.[2]  (Schaller Depos. at p. 39; Docket No. 18, Response to ¶ 5)  While Schaller expected to return from his FMLA leave as a customer service representative, he was not unhappy with this reassignment because he received the same pay and benefits that he had received prior to his leave.[3]  (Docket No. 24 at ¶ 4)  Schaller also testified that, to his knowledge, his job title did not change.  (Schaller Depos. at p. 40)

During the first four months after his return, Schaller underwent chemotherapy treatment.  (Docket No. 24 at ¶ 7)  Schaller outlined his chemotherapy schedule for DAC, which they

---

[1] Schaller requested this FMLA leave on August 1, 2002.  (Docket No. 18, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 2)  Schaller testified that he did not have any problems obtaining FMLA leave.  (*Id*. at ¶ 3; Schaller Depos. at p. 37)

[2] Toby Hensley, the operations manager at DAC and Schaller's direct supervisor, also testified that Schaller "was assigned to clean up the database in the first few months that he was employed.  That began then, and he continued to do that all along."  (Docket No. 20, Attach. 4, Deposition of Toby Hensley, at p. 16)

[3] Plaintiff was hired at a pay rate of $12.00 an hour and was paid the same rate for the entire duration of his employment at DAC.  (Docket No. 18 at ¶ 1)

2

accommodated by allowing him to take time off for his treatments. (Schaller Depos. at p. 41)

Schaller submits, by declaration testimony, that, during this time period, he lost all of his hair,

suffered extreme fatigue, and "coped with other health issues generally associated with

chemotherapy." (Docket No. 22, Declaration of Stephen Schaller, at ¶ 3) After each round of

chemotherapy, he would generally be unable to drive for two to three days or "perform many of

life's other normal activities." *Id.* While Schaller was able to work full-time, he claims that he

was physically unable to do much else during this time period. *Id.* After he finished the

chemotherapy treatments, Schaller testified that he suffered "a good deal of fatigue" for at least

six months but that he had no other physical limitations. (Schaller Depos. at p. 51) After this

six-month period, he did not have any physical impairments or limitations as a result of the

surgery or the chemotherapy. *Id.*

However, Schaller did have a scar on his chest as a result of his mastectomy. Schaller

testified that, in October of 2003, he told Chad Young, DAC's Director of Human Resources,

that he intended to take a few weeks off in the spring of 2004 in order to have reconstructive

surgery on his chest as a result of the mastectomy.[4] (Schaller Depos. at pp. 43–44; Docket No.

22, Schaller Decl. at ¶ 7) Specifically, Schaller inquired as to the status of his health savings

account and asked related questions of Young in order to save money for the reconstructive

surgery. (Schaller Depos. at p. 45; Docket No. 22, Schaller Decl. at ¶ 9) Schaller claims that he

informed Young of his intentions so that DAC could make whatever arrangements were

necessary during his absence. (Docket No. 22, Schaller Decl. at ¶ 8)

---

[4]According to Schaller, the subject came up because of his need to complete the "benefits package information," which included information regarding health insurance and was due at the end of October. *Id.* at p. 44.

Schaller also states that he had earlier informed his supervisor, Toby Hensley, of his intentions to have reconstructive surgery. (Docket No. 24 at ¶ 41) According to Schaller and Stephen Smith, a co-employee who witnessed the conversation, Hensley commented that Schaller didn't need surgery because it was "just a little scar" and that he could just wear a shirt if he went to the beach. (Schaller Depos. at p. 49; Docket No. 20, Attach. 8, Deposition of Stephen Smith, at p. 48) Hensley denied making these comments, but stated that he understood that it would require Schaller to take time off from work in order to have the surgery. (Docket No. 20, Attach. 4, Deposition of Toby Hensley at p. 42)

On Monday, November 17, 2003, Schaller was terminated from the defendant's employ.[5] (Docket No. 24 at ¶ 1) He was fifty-three years old. *Id*. Three days earlier, on Friday, November 14, 2003, DAC also terminated Stephen Smith, a fifty-five year-old who worked in telemarketing, and Sara Lindsey, a fifty-eight year-old customer service representative.[6]

It is undisputed, for purposes of summary judgment, that, several weeks before his termination, Smith asked Young for information on how to initiate a claim under DAC's insurance policy. *Id*. at ¶ 30. Additionally, Hensley, who was also Smith's supervisor, testified that, prior to his termination, Smith "walked around that building coughing like crazy, so something was obviously wrong with him...." *Id*. at ¶ 31. On November 12, 2003, Smith had been diagnosed with lung cancer. *Id*. at ¶ 32. However, Fulton testified that, at the time he

---

[5] According to Schaller, he was asked by Fulton to sign a severance agreement in exchange for a severance payment immediately upon his termination, and he was not provided twenty-one days to review it before signing, as is normally required. Rather, he was told he would have to review and sign immediately if he wished to receive a severance payment. (Schaller Decl. at ¶ 10)

[6] At the time of their terminations, these employees earned the following salaries: Mr. Smith was paid $10.35 per hour, plus a commission of $5 for every appointment he scheduled, and Ms. Lindsey was paid $12 per hour. (Docket No. 24 at ¶¶ 13–14)

4

learned of his cancer diagnosis, the decision to eliminate his telemarketing position had already been made.  (Docket No. 20, Attach. 3, Deposition of Dean Fulton, at p. 105)

With respect to Lindsey, DAC also admits that, approximately seven weeks after her termination, Lindsey was diagnosed with, and passed away as a result of, liver and pancreatic cancer.  (Docket No. 24 at ¶ 35)  Prior to her termination, Young was aware that Lindsey was suffering from shingles, but he testified that she did not look like she was in pain.  *Id*. at ¶ 37; Young Depos. at p. 58)  According to Lindsey's sister, however, Lindsey was in severe pain for several weeks prior to her termination, which should have been noticeable to anyone observing her.  (Docket No. 24 at ¶ 36)  Plaintiff contends that all three employees, Schaller, Smith, and Lindsey were terminated on the basis of their age and their disabilities.

DAC disputes this contention.  The General Manager of DAC, Dean Fulton, testified that, in the months preceding plaintiff's separation from the company, management began discussing ways to maximize the profitability of the center and made a business decision to reduce the staff by three positions.[7]  (Docket No. 18 at ¶ 8)  Fulton stated that he discussed with all of the department heads the jobs that might be considered nonessential business functions, and that the duties  identified for elimination were the database cleanup process, telemarketing, and one customer service position.  (*Id*. at ¶¶ 9,10)  According to Fulton, DAC took other measures to reduce overhead in 2003, but he could not recall specifically what they were.  (Fulton Depos. at p. 59)  He did testify, however, that he constantly sent emails  to other managers about reducing overhead.  *Id*. at p. 61.

---

[7] It is undisputed that, in 2003, DAC had a shortfall of approximately $1.45 million between its actual and budgeted revenue.  (Docket No. 24 at ¶ 10)

5

When Schaller was terminated, the database cleanup job was 95% completed. *Id*. at ¶ 11.

Although no one replaced Schaller as a full-time "database cleanup" employee (Docket No. 18 at

¶ 12), the defendant admits, for purposes of summary judgment, that all of Schaller's job

responsibilities were "rolled up" into the Customer Service Department (Docket No. 24 at ¶ 27).

Similarly, some of Smith's job responsibilities were "rolled up" into the Customer Service

Department, *Id*., and Lindsey's job duties were transferred to the remaining customer service

representatives in the Customer Service Department (Fulton Depos. at p. 46). The defendant

also admits, for purposes of summary judgment, that DAC utilized temporary workers in the

Customer Service Department following the termination of Schaller, Smith, and Lindsey.[8]

(Docket No. 24 at ¶ 26) However, DAC contends that, since Lindsey's termination, the total

number of customer service positions has further decreased from seven to six. (Docket No. 16,

Affidavit of Chad Young at ¶¶ 4, 5) Thus, according to the defendant, the temporary workers

were used to replace or substitute for existing positions. DAC further admits, for purposes of

summary judgment, that, on July 12, 2004, Fulton contacted Smith to determine whether he was

interested in returning to work at Donelson. (Docket No. 24 at ¶ 34) Chad Young, however,

was completely unaware of this offer.[9] *Id*.

On June 22, 2004, the plaintiff filed a Complaint in this court, alleging that his

termination was in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §

---

[8] Documents produced by DAC indicate that the company used over 2,000 hours of work from temporary employees in a six-month period in 2004. (Docket No. 24 at ¶ 26)

[9] According to Young, as a result of "continuing budgetary concerns," DAC laid off approximately nineteen additional people in July of 2004. (Docket No. 24 at ¶ 17) According to Fulton, however, these layoffs occurred as a result of a directive from DAC's parent company for DAC to outsource much of its accounting work. *Id*. at ¶ 18. DAC admits that the layoffs that occurred in 2004 were not solely based on a 2003 budgetary shortfall. *Id*. at ¶ 19

12101, *et seq.*, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, *et seq.*, and the Tennessee Handicap Discrimination Statute, Tenn. Code Ann. § 8-50-103, *et seq.*[10]  (Docket No. 1, Complaint, at ¶ 1) Currently before the court is the defendant's Motion for Summary Judgment as to all claims. (Docket No. 12)

ANALYSIS

I.      *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1477 (6th Cir. 1989).  In determining whether the moving party has met its burden, the court must view the factual evidence and draw reasonable inferences in the light most favorable to the nonmoving party.  *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986);

---

[10] Smith, together with Jack Lindsey, acting on behalf of the Estate of Sara Lindsey, filed a related Complaint in this court on May 25, 2005.  *Smith v. Donelson Air Conditioning Co*., 3:05-cv-00398.  The defendant has likewise filed a Motion for Summary Judgment in that case (Docket No. 9), to which the plaintiffs have not yet responded.

7

*McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). If the nonmoving party, however, fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." *Gaines v. Runyon*, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To determine whether the nonmoving party has raised a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his favor. Id. at 255.

The court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251–52). "There is no genuine issue for trial unless

8

the nonmoving party has produced enough evidence for a jury to be able to return a verdict for that party." *Tinsley v. General Motors Corp.*, 227 F.3d 700, 703 (6th Cir. 2000). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

II.     *Discrimination on the Basis of Disability*

The ADA provides, in pertinent part, that covered entities, including private employers, shall not "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2005). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). By its terms, the ADA prohibits an employer from discharging an employee because of his or her disability. 42 U.S.C. § 12112(a).

To establish a prima facie case of discrimination on the basis of disability under the ADA, the plaintiff must show: (1) he is an individual with a disability; (2) he was otherwise qualified to perform requirements of his job with or without reasonable accommodation; and (3) he was discharged or subject to an adverse job action because of the disability. *See Henderson v.*

9

*Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001); *Walsh v. United Parcel Serv.*, 201 F.3d 718, 724 (6th Cir. 2000); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996). If these elements are shown, the defendant must offer a legitimate explanation for its action that is unrelated to the employee's disability in order to avoid a mandatory inference that it intentionally discriminated against the employee. *Monette*, 90 F.3d at 1185–86. If the defendant is able to satisfy this burden of production, the burden shifts to the plaintiff to introduce evidence showing that the proffered explanation was pretextual. *Id*. at 1186.

The defendant takes issue with the first prong of the plaintiff's prima facie case of disability discrimination, asserting that plaintiff has failed to show that he is an "individual with a disability" under the ADA. (Docket No. 13 at p. 6) An individual is "disabled" within the meaning of the ADA if he: (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) has "a record of such an impairment;" or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2).

Plaintiff first alleges that his cancer constitutes a physical impairment that substantially limits one or more of his major life activities, and that he was terminated as a result of this disability. (Docket No. 1 at ¶¶ 20, 23) The diagnosis of an impairment alone, however, is not enough to establish that a plaintiff is disabled under the ADA. *See Williams*, 534 U.S. at 198 ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."); *see also* 29 C.F.R. app. § 1630.2(j) (The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the

10

life of the individual), *quoted in Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999).[10]

Plaintiff admits in his deposition that he was not substantially limited in a major life activity at the time of his termination. He claims that he suffered from "a good deal of fatigue" for the six months following his surgery and chemotherapy, but he concedes that he had no limitations after that time. (Schaller Depos. at p. 51) Regardless of plaintiff's limitations prior to his termination, he has failed to create a genuine issue of material fact as to whether he was actually disabled at the time of his termination.[11] To prevail on an ADA claim under the first method of proving disability, an individual must be substantially limited in a major life activity at the time of the adverse employment action. *See Ferrette v. Cuyahoga County Bd. of Elections*, 105 Fed. Appx. 722, 727 (6th Cir. 2004) (finding that a plaintiff could not demonstrate that she was substantially limited in the major life activity of speaking when "she had regained the ability to speak . . . and there is no evidence that she could not speak at the time her employment was terminated").

---

[10] Plaintiff also makes a claim of disability discrimination pursuant to the Tennessee Handicap Act ("THA"), T.C.A. § 8-50-103. Because case law interpreting the ADA is also applicable to a claim under the THA, these two claims will be considered together. *See Chandler v. Specialty Tires of Am., Inc.*, No. 02-6434, 2005 WL 1432789, at *3 (6th Cir. June 17, 2005) (citing *Barnes v. Goodyear Tire & Rubber Co.*, 28 S.W. 2d 698, 705 (Tenn. 2000)).

[11] To the extent that plaintiff asserts that he had a "record of" a substantially limiting impairment (Docket No. 1 at ¶21), such a claim must fail. To establish this claim, plaintiff would have to present evidence that he has a record of an impairment that substantially limits a major life activity. *See Sebest v. Campbell City Sch. Dist. Bd. of Educ.*, 94 Fed. Appx. 320, 326 (6th Cir. 2004). This would require showing (1) "a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment," and (2) that the impairment indicated in the record would substantially limit one or more major life activities. 29 C.F.R. app. § 1630.2(k), *quoted in Horowitz v. L. & J.G. Stickley, Inc.*, 20 Fed. Appx. 76, 78 (2d Cir. 2001). Without reaching the question of whether Schaller suffered from an impairment that substantially limited one or more major life activities at the time of his FMLA leave in 2002, he has not provided any evidence that a record of such an impairment existed, or that Donelson relied on any such record. In addition, as discussed *infra*, plaintiff has not provided any evidence that Donelson relied on his health conditions in any capacity when it terminated him. Therefore, to the extent that plaintiff is claiming that he was disabled because he had a record of a substantially limiting impairment, such a claim will be dismissed.

Case 3:04-cv-00545   Document 25   Filed 08/04/05   Page 11 of 27 PageID #: 11

Plaintiff next argues that, because he was actually disabled when he returned from his mastectomy, and because it was "during this period that Donelson began taking its discriminatory actions against Mr. Schaller on the basis of this disability and his age that ultimately led to his termination," Donelson regarded him as disabled when he was terminated.[12] (Docket No. 17 at p. 10)

There are two ways in which an individual may be "regarded as" disabled under the ADA: (1) an employer mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) an employer mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *Sutton*, 527 U.S. at 490; *see also Mahon*, 295 F.3d at 592; *Henderson v. Ardco, Inc.*, 247 F.3d 645, 650 (6th Cir. 2001). "In both cases, it is necessary that [an employer] entertain misperceptions about the individual- -it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 490; *Henderson*, 247 F.3d at 650; *see also Mahon*, 295 F.3d at 592 (dismissing a plaintiff's "regarded as" disability claim because he would not show that the defendant "held any *mistaken* belief about him") (emphasis in original). The purpose of this

_____

[12] To the extent that plaintiff's argument amounts to an allegation that his reassignment in and of itself constitutes an actionable adverse action, the court cannot so find. The Sixth Circuit has defined adverse employment action as one that causes a "'materially adverse' change in the terms or conditions of employment because of the employer's actions. *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) (citing *Kocsis Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996) (internal citations omitted)). Such change must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to qualify as adverse employment action. *Hollins v. Atl. Co., Inc.*, 188 F.3d 652, 662 (6th Cir. 1999). At the time of his reassignment, plaintiff retained the same pay and title. He also testified that the change in duties was acceptable to him. (Schaller Depos. at pp. 39–40) Specifically, Schaller stated that he "was assigned by Toby to continue work that [he] had been talking to him about on the database of Donelson Air Conditioning in the AC service," and that such a change was "fine." *Id.* at p. 39. For these reasons, the court cannot conclude that plaintiff's change in job responsibilities was an adverse employment action, in and of itself, for the purposes of establishing an ADA claim.

12

section is to "allow individuals to be judged according to their actual capacities, rather than through a scrim of 'myths, fears, and stereotypes' accruing around a perceived impairment." *Mahon*, 295 F.3d at 592 (citing *Sutton*, 527 U.S. at 489–90).

Plaintiff appears to argue that he has an actual, nonlimiting impairment, in the form of a history of cancer, and that, since the first adverse job action (a reassignment to a job duty that was later deemed non-essential) was taken when he was actually disabled, there is sufficient evidence that Donelson regarded him as disabled upon termination. Assuming that plaintiff was actually disabled at the time that he was reassigned to the database cleanup position in September of 2002, this is not sufficient evidence to create a genuine issue of fact that he was regarded as disabled by Donelson at the time of his termination, one year later. Plaintiff has failed to specifically identify the major life activity or activities that Donelson mistakenly believed were limited by plaintiff's history of cancer. He simply alleges that he "was reassigned to a job that would be eliminated so that he could be terminated and Donelson could avoid accommodating him in the future should his cancer reoccur." (Docket No. 17 at p. 11) The court interprets this statement as an allegation that Donelson mistakenly believed that plaintiff's actual, nonlimiting history of cancer substantially limited him in the major life activity of working because it would prohibit him from working in the future.

To establish that Donelson regarded him as disabled in the major life activity of working, the plaintiff must establish that the employer regarded him as being unable to work in a broad class of jobs. "An employer does not necessarily regard an employee as disabled 'simply by finding the employee to be incapable to satisfying the singular demands of a particular job.'" *Cotter*, 287 F.3d at 599 (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir.

13

1996); *see also Linser v. Ohio Dep't of Mental Health*, No. 99-3887, 2000 WL 1529809, at *4 (6th Cir. Oct. 6, 2000) (emphasizing that to be regarded as substantially limited in the major life activity of working, an individual "**must be regarded as precluded from more than a particular job**.") (quoting *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999) (emphasis in original).

As evidence that Donelson regarded him as disabled, plaintiff points only to the fact that he was assigned to new job duties following his return from FMLA leave in September of 2002. (Docket No. 17 at pp. 10–11) However, plaintiff has provided no evidence that Donelson changed plaintiff's job responsibilities or terminated him because of its perceptions of his health.[13] Upon his return to work in September of 2002, he was assigned the responsibility of cleaning up the Donelson database—a position that he had previously discussed with his supervisor and had done some preliminary work in. (Schaller Depos. at p. 39) He held the position for fourteen months and, at the time of his termination, the database job was 95% complete. Plaintiff has not provided any evidence that Donelson had any *misperceptions* regarding his health, in that it believed his impairment to be substantially limiting, in either September of 2002 or November of 2003. In fact, plaintiff admits that, upon his return from FMLA leave, Donelson was accommodating of his cancer treatments, which lasted four months, and at no time prevented Schaller from working full time. (Schaller Depos. at p. 41) *See Mahon*, 295 F.3d at 592 (finding that, by accommodating an employee, an employer "was not

---

[13] To the contrary, Toby Hensley testified that plaintiff had done some work on the database cleanup throughout his time as a customer service representative. He claims that plaintiff was assigned to the database cleanup position full-time because other customer service representatives had been complaining that plaintiff did not answer the phones, as he was required to do, because he was too busy working on the database. (Hensley Depos. at pp. 16–17)

wrongly viewing [him] through a stereotype of disability, 'but rather follow[ing] the specific recommendations of [a] treating physician, the course the Supreme Court says is the correct one in *Williams*'") (quoting *Cannon v, Levi Strauss & Co.*, 29 Fed. Appx. 331 (6th Cir. 2001)) (emphasis in original). Under this set of facts, no reasonable juror could conclude that Donelson regarded Schaller as substantially limited in his duties as a customer service representative or in cleaning up the database.

Even if Donelson did regard plaintiff as substantially limited in his former position as customer service representative, or in his last position cleaning up the database, plaintiff has provided no evidence that Donelson regarded him as disabled in a broader class of jobs. *See Linser*, 2000 WL 1268 at *4 (granting summary judgment when there was no evidence that a plaintiff was regarded as limited in a class of jobs or broad range of jobs). For these reasons, the court concludes that plaintiff has not created a genuine issue of material fact concerning whether Donelson regarded him as substantially limited in the major life activity of working. Because Schaller has failed to establish that he was an "individual with a disability" at the time of his termination, he cannot recover on his claim that he was discriminated against on the basis of disability. Accordingly, the defendant's Motion for Summary Judgment will be granted as to this claim.

III.     *Discrimination on the Basis of Age*

It is unlawful under the ADEA for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1). To establish a claim under the ADEA, a plaintiff may either produce direct evidence of age discrimination, or rely upon circumstantial evidence that would permit an inference of discrimination under the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981). *Coomer v. Bethesda Hosp., Inc*., 370 F.3d 499, 510–511 (Sixth Cir. 2004); *Hedrick v. W. Reserve Care Sys*., 355 F.3d 444, 459 (6th Cir.2004); *Kline v. Tennessee Valley Auth*., 128 F.3d 337, 348–49 (6th Cir.1997). Here, Schaller relies on circumstantial evidence to establish his age discrimination claims asserted under both the ADEA and the THRA.[14]

To establish a *prima facie* case of age discrimination, a plaintiff must come forward with evidence that: (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) was either replaced by a substantially younger person, or was treated less favorably than a similarly situated employee from outside the protected class. *Coomer*, 370 F.3d at 510–511; *see also McElroy v. Philips Med. Sys. N. Am., Inc*., Nos. 03-6219, 03-6351, 2005 WL 406335, at **5 (6th Cir. Feb. 18, 2005). If the plaintiff successfully establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a non-discriminatory reason for its adverse employment action. *Burzynski v. Cohen,* 264 F.3d 611, 622 (6th Cir. 2001). "If the defendant comes up with such a reason, the plaintiff must then demonstrate by a preponderance of the evidence that the defendant's proffered reason was a pretext for age discrimination." *Id.*

---

[14] The analysis of age discrimination claims under the THRA is the same as under the ADEA. *McElroy v. Philips Medical Systems North America, Inc*., Nos. 03-6219, 03-6351, 2005 WL 406335, at **5 (6th Cir. Feb. 18, 2005) (citing *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. Ct. App.1995)).

16

The defendant contends that Schaller has failed to establish the fourth element of his *prima facie* case of age discrimination because he was not replaced at all, much less by a substantially younger person.  (Docket No. 13 at pp. 12–13)  According to the defendant, the database cleanup position was not filled by anyone after plaintiff's termination.  *Id*. at 12.  Donelson also maintains that no one replaced Mr. Smith or Ms. Lindsey, and their duties were allocated among remaining employees.  *Id*.  The defendant claims that the evidence of these three terminations alone is not enough for plaintiff to establish a *prima facie* case, and that the plaintiff has provided no additional direct, circumstantial, or statistical evidence to maintain his ADEA claim.  *Id*. at 13.

The plaintiff first responds to these arguments by claiming that he was treated unfavorably compared to those outside of his protected class when he was transferred to the database cleanup position, which was, one year later, deemed a non-essential position.  (Docket No. 17 at p. 12)  He also points to the fact that Mr. Smith and Ms. Lindsey were also over fifty at the time that they were terminated.  *Id*. at 2.  The Supreme Court recently addressed the issue of disparate impact in ADEA cases in *Smith v. City of Jackson*.  125 S.Ct. 1536 (2005).  The *Smith* Court explained that "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact.  Rather the employee is responsible for isolating the *specific* employment practices that are allegedly responsible for any observed statistical disparities."  *Id*. at 1545 (internal citations and quotations omitted) (emphasis in original).  Plaintiff has not identified any specific practice that led to the termination of these three employees, but has simply alluded to the theory that they were all fired based on age.  Additionally, plaintiff has not provided *any* evidence that age played a role in his termination or

his reassignment to the database cleanup position. To the contrary, plaintiff testified in his deposition that he had no basis for the claim that he was terminated because of his age other than "feelings and speculation." (Schaller Depos. at p. 70) This is insufficient to establish that plaintiff was treated less favorably than others outside of his protected class.

Plaintiff also asserts, as evidence that he was treated less favorably, that he was replaced because his position was not actually eliminated. He alleges that the responsibility of maintaining the database was transferred to the remaining customer service representatives, and Donelson hired temporary workers in that department following his termination. (Docket No. 17 at p. 13) When a reduction in force takes place, a terminated employee is not actually replaced when his duties are distributed among existing employees performing related work. *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990). However, an employee may still be able to claim that he was replaced when other employees take over his duties only on a temporary basis. *See Erwin v. Potter*, 79 Fed. Appx. 893, 901 (6th Cir. 2003). Plaintiff cannot use this method of establishing that he was replaced by someone substantially younger or treated less favorably than others outside of his protected class, however, because he has not provided any evidence of the ages of the temporary workers employed by Donelson. Plaintiff testified in his deposition that he does not have any knowledge as to whether the temporary workers were either younger than forty or substantially younger than he. (Schaller Depos. at p. 69) Because plaintiff cannot establish the fourth element of his *prima facie* case of discrimination on the basis of age under the ADEA, the defendant's Motion for Summary Judgment will be granted as to that claim.

18

IV.    *Retaliation Under the FMLA*

The FMLA entitles an eligible employee to as many as twelve weeks of leave per year for a "serious health condition that makes the employee unable to perform the functions of the position of such employee."[15]  29 U.S.C. § 2612(a)(1)(D) (2005).  An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" an employee's rights under the FMLA.  29 U.S.C. § 2615(a)(1).  It is also unlawful for an employer to "discharge or in any other manner discriminate against any individual" who opposes an employer's interference with such rights.  29 U.S.C. § 2615(a)(2); *see also Skrjanc v. Great Lakes Power Serv. Co.*, 282 F.3d 309, 314 (6th Cir. 2001) (finding that the FMLA also protects employees who declare an intention to take such leave in the future from retaliation).  Plaintiff claims that Donelson terminated his employment in violation of the FMLA in retaliation for his notifying the defendant of his intent to take time off for reconstructive surgery in the Spring of 2004. (Docket No. 1 at ¶¶ 26–28)

To establish a prima facie case of FMLA retaliation the plaintiff must establish that: (1) he availed himself of a protected right under the FMLA by notifying his employer of his intent to take leave, (2) he was adversely affected by an employment action when he was discharged, and (3) there was a causal connection between his exercise of a right under the FMLA and the adverse employment decision.  *Skrjanc*, 272 F.3d at 314 (citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990)); *see also Saroli v. Automative & Modular Components, Inc.*, 405 F.3d 446, 450 (6th Cir. 2005).  Once the plaintiff has made this showing,

---

[15]  As plaintiff points out, the defendant takes issue only with the adequacy of the notice and does not dispute that the reconstructive surgery was a serious medical condition.  (Docket No. 17 at p. 16)  Accordingly, for the purpose of deciding this motion, the court will assume that plaintiff's intent to take medical leave for his reconstructive surgery was a protected right under the FMLA.

the defendant bears the burden of producing evidence that the plaintiff was terminated for a legitimate, nondiscriminatory reason. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The plaintiff retains the burden of persuasion that the defendant's proffered reason is a pretext for discrimination. *Id.*

Donelson contends that plaintiff cannot establish his prima facie case of FMLA retaliation because (1) he did not provide Donelson with adequate notice of his intent to take FMLA leave, and (2) he cannot demonstrate a causal connection between his alleged request for leave and his termination. (Docket No. 13 at pp. 9–11)

"A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Syrjanc*, 272 F.3d at 315 (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 870 (6th Cir. 2001)). Accordingly, an employee need not specifically mention the FMLA to his employer in order to provide notice of his intent to take leave. 29 C.F.R. § 825.302(c); *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003); *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). An employee is required only to provide notice and a qualifying reason for requesting leave. *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 522 (6th Cir. 1998); *see also Chandler v. Specialty Tires of Am., Inc.*, 283 F.3d 818, 825 (6th Cir. 2002). "[T]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm*, 149 F.3d at 522 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 762 (5th Cir. 1995)); *see also Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 488 (6th Cir. 2005). "The employer should inquire further of the employee if it is necessary to have more information about whether

20

FMLA leave is being sought by the employee, and obtain the necessary details of the leave to be taken." 29 C.F.R. § 825.302(c). Whether notice is practicable in terms of its timing and content will depend upon the facts and circumstances of each individual case. *Cavin*, 346 F.3d at 724 (quoting *Manuel*, 66 F.3d at 764).

In this case, plaintiff points to two occasions as notice to Donelson of his intent to take leave for reconstructive surgery in the Spring of 2004. Plaintiff first alleges that he spoke with his supervisor Toby Hensley in June or July of 2003. (Schaller Depos. at p. 48) He claims that he informed Mr. Hensley that he had consulted plastic surgeons and intended to have reconstructive surgery, and that Mr. Hensley questioned the necessity of the surgery. *Id.* at pp. 48–49. While Mr. Hensley testified that he does not recall plaintiff's mentioning of leave, he admits knowing that plaintiff had intended to have the surgery and that he understood that it would require Schaller to take time off from work.[16] (Hensley Depos. at p. 42)

The second incident to which the plaintiff directs the court for the purpose of establishing notice is a conversation with Chad Young, Donelson's Office Manager, in October of 2003 about plaintiff's medical savings plan. (Schaller Depos. at pp. 44–47) According to Schaller, he informed Young of his plans to undergo reconstructive surgery in the Spring of 2004. *Id.* at p. 46. Plaintiff explains that he was trying to figure out how much money from his savings plan to set aside for the surgery and that he asked Young some questions about the program. *Id.* at pp. 46–47. The defendant does not dispute that this exchange took place, but rather argues only that it does not constitute adequate notice for purposes of plaintiff's FMLA retaliation claim. (Docket No. 13 at pp. 9–10) In light of the fact that both Young and Hensley were aware that

---

[16] Additionally, Stephen Smith testified in his deposition that he was present for the conversation between plaintiff and Mr. Hensley, and recalls Mr. Hensley questioning the need for surgery. (Smith Depos. at p. 48)

21

the surgery was related to plaintiff's earlier battle with cancer and his resulting mastectomy, the court concludes that a reasonable person could interpret these two encounters as sufficient to reasonably apprise Donelson of plaintiff's intention to take time off for a serious health condition.[17]  Because Donelson was sufficiently apprised of plaintiff's intention to take time off for a serious health condition, it became its responsibility to inquire further of Schaller about whether FMLA leave was being sought and obtain any necessary details of the leave to be taken. *See* 29 C.F.R. § 825.302(c).  Therefore, the plaintiff has created a genuine issue of material fact as to this element of his prima facie case.

The defendant also claims that Schaller has not provided evidence of a causal connection between his notifying Donelson of his intent to take FMLA leave and his termination.  However, in the Sixth Circuit, temporal proximity may provide sufficient indirect evidence of a causal connection for purposes of establishing a prima facie case of retaliatory discharge under the FMLA.  *Chandler*, 283 F.3d at 826; *see also Skrjanc*, 272 F.3d at 314 (accepting temporal proximity as sufficient evidence of a causal connection for the purpose of establishing a prima facie case of FMLA retaliation).  Plaintiff alleges that he discussed his intent to undergo reconstructive surgery with Chad Young in October of 2003.  (Schaller Depos. at p. 44)  It is undisputed that plaintiff was terminated approximately one month later, on November 17, 2003.  (Docket No. 1 at ¶ 16; Docket No. 4 at ¶ 16)  The court thus finds that plaintiff has established a causal connection for purposes of establishing his prima facie case of FMLA retaliation.

Because the plaintiff has established a prima facie case of retaliation under the FMLA,

---

[17] The fact that Hensley questioned the seriousness and necessity of the surgery (Schaller Depos. at p. 49) would lend support to plaintiff's contention that he provided adequate notice.

the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for terminating Schaller. Donelson has responded by claiming that it eliminated Schaller's "database cleanup" position (in addition to eliminating Mr. Smith's telemarketing position and reducing the number of employees in the Customer Service Department, where Ms. Lindsey worked) for the "sole purpose of cutting overhead costs" by eliminating non-essential positions. (Docket No. 13 at 17; Fulton Depos. at pp. 20–22) The defendant has satisfied its burden of production by providing this explanation. Therefore, the burden of persuasion rests with the plaintiff to demonstrate that this reason is pretext for discrimination.

To demonstrate an employer's explanation was pretextual, a plaintiff must show either: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's actions; or (3) that they were insufficient to motivate the employer's actions.[18] *Manzer*, 29 F.3d at 1084. While plaintiff admits that Donelson had a budgetary shortfall for the 2003 fiscal year, he appears to argue that the defendant's proffered explanation had no basis in fact because Donelson did not actually eliminate the positions or that the positions were not actually non-essential. He relies primarily on evidence that Donelson hired temporary workers following the termination of the plaintiff, Mr. Smith, and Ms. Lindsey, and that Mr. Fulton offered a job to Mr. Smith a few days after being served with Schaller's Complaint. Plaintiff also asserts that pretext is evidenced by the fact that eliminating three employees would not be a sufficient measure to address a large-scale budget shortfall, and the fact that he was given a severance agreement to sign without being given adequate time to

---

[18] Plaintiff does not indicate under which of the three *Manzer* theories he is attempting to show pretext. Because his arguments seem to center around an assertion that Donelson did not actually eliminate non-essential positions, the court will assume that plaintiff is claiming that Donelson's proffered reason for terminating his employment had no basis in fact—the first *Manzer* prong.

review it.[19]  (Docket No. 17 at pp. 14–15)

Plaintiff has provided evidence that Donelson utilized temporary workers in the

Customer Service Department following the termination of the three employees.  Mr. Fulton

explained in his deposition testimony that Donelson often employed temporary workers in this

department during its busy seasons.  (Fulton Depos. at pp. 29–31)  During a six-month period in

2004, Donelson employed temporary workers for over two-thousand hours of work.  (Docket

No. 17, Ex. A; Docket No. 24 at ¶ 26)  It would be possible for a reasonable juror to find that

the positions were not eliminated because, as Debra Rose, Human Resources Manager for Lenox

(Donelson's parent company), pointed out, hiring temporary workers following the termination

of permanent employees does not "sound like a job elimination."  (Docket No. 20, Attach. 6,

Rose Depos. at pp. 39–40)  Based on this evidence, the plaintiff has raised a genuine issue of

material fact as to whether Donelson's contention that it eliminated non-essential positions has a

basis in fact.

Plaintiff has also provided evidence that Dean Fulton, Donelson's General Manager,

called Mr. Smith to discuss the possibility of hiring him a few days after Donelson was served

with plaintiff's Complaint.  Plaintiff argues that this was done to make his case "more difficult to

---

[19] Plaintiff also makes arguments for pretext based on alleged "statistical evidence that these terminations
were based upon the age" of the terminated employees and a claim that some of Mr. Smith's duties were reassigned
to younger employees.  (Docket No. 17 at p. 15)  Because the court finds that the plaintiff has not established a
*prima facie* case of discrimination under the ADEA, however, it need not address these additional arguments for
pretext.  Nor will the court consider Schaller's argument that Donelson's failure to produce documentation relating
to the decision to terminate him constitutes evidence of pretext.  This is not additional evidence offered by the
plaintiff, but an argument that Donelson had an obligation to produce evidence beyond its legitimate, non-
discriminatory reason.  Requiring a production of such documents would impermissibly shift the burden of
persuasion to the defendant when its only obligation is to produce a legitimate, non-discriminatory reason for the
termination.  *See McGrath*, 48 Fed. Appx. at 553 ("Plaintiff's argument that the defendants failed to produce
projected workloads, mission objectives, and evidence explaining CES Director Thompson's decision to eliminate
five MME positions is misplaced as plaintiff bore the burden of persuasion that the defendants' proffered reasons
have no basis in fact.").

pursue," and points out that it was done during a time when Donelson was purportedly terminating other employees due to budget shortfalls. (Docket No. 17 at p. 14) Mr. Smith confirmed plaintiff's statements regarding the phone call and testified that Mr. Fulton called him on or about July 12, 2004. (Docket No. 21, Smith Decl. at ¶ 3) During that phone call, according to Mr. Smith, Mr. Fulton indicated that Donelson was hiring and inquired about Mr. Smith's interest in returning to work. *Id*. at ¶ 4. However, Mr. Fulton was unable to provide any details about the position. *Id*. In his deposition testimony, Mr. Fulton confirmed that he spoke with Mr. Smith regarding a new position at Donelson—although he claims that he was unaware of Mr. Schaller's lawsuit at the time. (Fulton Depos. at p. 108–10) Mr. Fulton also explained that he had not designed a specific position for Mr. Smith at the time of the phone call. *Id*. A reasonable juror could infer from this fact that, as plaintiff alleges, Donelson was attempting to make his lawsuit more difficult to pursue or conceal a discriminatory motive.

Plaintiff has also provided the court with additional evidence of pretext. He asserts that the termination of himself, Mr. Smith, and Ms. Lindsey would not have been a solution to the budgetary constraints because the amount of money saved by these terminations was minor in comparison to the shortfall. (Docket No. 17 at p. 15) Donelson has admitted that its budgetary shortfall for the 2003 fiscal year was approximately $1,453,748. (Docket No. 24 at ¶ 10) The three terminated employees, however, each earned less than $30,000 per year. (Docket No. 17 at p. 15) The parties have agreed that the employees were paid as follows: Mr. Schaller was paid $12 per hour, Mr. Smith was paid $10.35 per hour plus commission of $5 for every appointment he scheduled, and Ms. Lindsey was paid $12 per hour. Pretext could be inferred from the fact that this alleged elimination of non-essential positions would have little impact on the budgetary

shortfall.

Plaintiff's final piece of evidence offered in support of a showing of pretext involves a severance agreement presented to him upon his termination. According to Schaller, Mr. Fulton presented him with the agreement upon his termination and told him it had to be signed immediately if he wanted to receive a severance payment. (Docket No. 24 at ¶ 29; Schaller Decl. at ¶ 10) Ms. Rose testified that employees are supposed to be given twenty-one days to review a severance agreement, and represented that the provision explaining this right was inexplicably missing from Mr. Schaller's agreement. (Docket No. 24 at ¶ 28; Rose Depos. at pp. 33–35) She explained that it would not be typical protocol to expect an employee to sign the agreement immediately and that her advice would be to not accept the signed agreement until an employee has had it for at least twenty-four hours. (Rose Depos. at p. 35) These facts provide additional evidence upon which a jury could conclude that Schaller was terminated for a discriminatory purpose.

Based upon the aforementioned facts, the court finds that the plaintiff has provided sufficient evidence upon which a reasonable jury could conclude that Donelson's explanation for plaintiff's termination lacks credibility and that its proffered reason for his termination was a pretext for discrimination. Accordingly, the defendant's Motion for Summary Judgment will be denied as to plaintiff's FMLA claim.

CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment (Docket No. 12) will be granted as to plaintiff's claims of discrimination on the basis of disability under the ADA and the THA and plaintiff's claims of age discrimination under the ADEA and the THRA.

Defendant's Motion for Summary Judgment will be denied as to plaintiff's claim of FMLA

retaliation.

      An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge